IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FLOYD BUMPERS,<br><br>Plaintiff,<br><br>vs.<br><br>ADAM CLEVELAND ET AL.,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:08-cv-00283<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

This matter is before the court on Defendant Adam Cleveland's ("Trooper Cleveland") Motion for Summary Judgment. Trooper Cleveland[1] stopped Plaintiff Floyd Bumpers for allegedly following another vehicle too closely and for possibly having a broken windshield. Bumpers asserts that Trooper Cleveland conducted an unlawful search and seizure in violation of the Fourth Amendment and the due process and equal protection rights of the Fourteenth Amendment. Trooper Cleveland asserts he is entitled to qualified immunity because he operated within the scope of his employment as a Utah Highway Patrol Officer when he stopped Bumpers. After due consideration of the memoranda, documents, oral argument, and the facts and law relevant to this matter, the court grants in part and denies in part Trooper Cleveland's Motion for Summary Judgment.

---

[1]  Trooper Cleveland now has a different position and job title with the Utah Highway Patrol. Because he was a trooper at the time of the incident, however, the court uses that title in this decision.

## FACTUAL BACKGROUND

**The Initial Traffic Stop**

Bumpers is a 66-year-old African-American man.  On June 12, 2007, he was traveling northbound on Interstate 15 in southern Utah when Trooper Cleveland pulled him over.  Trooper Cleveland testified in deposition that prior to pulling Bumpers over he was facing southbound and had just completed a traffic stop of another vehicle.[2]  He then did a U-turn in the median and started traveling northbound at approximately 10:16 a.m.[3]  He testified he never saw Bumpers prior to making the U-turn.[4]

At 10:17:05 a.m., Trooper Cleveland activated his dashboard videotape recorder and recorded footage for two seconds.  The footage shows a semi-truck and vehicle at a great distance ahead of Trooper Cleveland.[5]  At 10:18:24, Trooper Cleveland reactivated the recorder.  This recording begins with Trooper Cleveland narrating that a vehicle was starting to get too close to a semi-truck again, and that "just a minute ago" before he activated the recorder, the vehicle was traveling too close to the semi.[6]  The recording then shows Trooper Cleveland following Bumpers for approximately twenty-five seconds.  During that time, Trooper Cleveland further stated on the recording that it looked like Bumpers' windshield might be cracked and that Bumpers was starting to get too close

---

[2]  Deposition of Adam Cleveland, 22:3–6 (Docket No. 13, Ex. B) (hereinafter "Cleveland Depo.").

[3]  Id.; Declaration of Trooper Adam Cleveland, ¶ 7 (Docket No. 13, Ex. A) (hereinafter "Cleveland Decl.")

[4]  Cleveland Depo., 22:7–13.

[5]  Videotape, 10:17:05–10:17:07 (Docket No. 13, Ex. A-1).

[6]  Videotape, 10:18:24–10:18:49.

to the semi-truck again.[7]  At that point, Trooper Cleveland initiated a traffic stop.

Trooper Cleveland informed Bumpers that he had pulled him over because he was following too closely.[8]  Bumpers responded that he did not realize he had done so.[9]  Trooper Cleveland then questioned Bumpers and learned that Bumpers was a resident of Iowa and was traveling home after visiting relatives in Las Vegas, Nevada.  Trooper Cleveland questioned Bumpers for approximately two minutes about his travel plans, including where he was headed, where he had come from, the length of his trip, where he had stayed, the location of where he had stayed, which of his family members he had visited, and his prior trips to Las Vegas.[10]

After questioning Bumpers, Trooper Cleveland returned to his patrol car to verify Bumpers' driver license and registration and check whether Bumpers had any prior criminal history.  After completing the background check, and finding nothing of concern, Trooper Cleveland returned to Bumpers' vehicle and asked him to step out of it.[11]  When Bumpers did so, Trooper Cleveland returned Bumpers' documents to him and informed him that he was issuing a warning rather than a citation.[12]  Bumpers stated that in forty-plus years he had never been pulled over for following too closely.[13]  Trooper Cleveland wished him a safe trip and Bumpers took a step back towards his

---

[7]  Videotape, 10:18:30–10:18:49.

[8]  Videotape, 10:19:44–10:19:46.

[9]  Videotape, 10:19:54–10:19–56.

[10]  Videotape, 10:20:04–10:22:00.

[11]  Videotape, 10:32:07.

[12]  Videotape, 10:32:38.

[13]  Videotape, 10:33:20; 10:33:41–10:33:45.

vehicle.[14]   At that point, Trooper Cleveland asked him if he could ask him more questions.[15]

Bumpers responded "Sure."[16]

**The Continued Questioning**

Trooper Cleveland began again asking Bumpers about his travel plans, the nursing home

where his mother was living, and why Bumpers had stayed at a hotel rather than with his family.[17]

He then asked if Bumpers was carrying anything illegal in his vehicle.  Additionally, he asked him

if he was carrying large amounts of currency, weapons, explosives, illegal drugs, heroin, cocaine,

methamphetamine, marijuana, etc.[18]   After Bumpers responded "No" to each question, Trooper

Cleveland asked if he could search his car.[19]

Bumpers said "Why do you think – May I show you something – Sometimes people think

my eyes – I have glaucoma."[20]   Bumpers then extracted a card from his wallet to show Trooper

Cleveland that his eyes were red due to glaucoma.[21]   Trooper Cleveland responded "I am not worried

about your eyes."[22]

The following exchange then occurred:

---

[14]   Videotape, 10:33:50–10:33:54.

[15]   Videotape, 10:33:55.

[16]   Videotape, 10:33:56–10:33:57.

[17]   Videotape, 10:33:59–10:36:18.

[18]   Videotape, 10:36:19–10:37:03.

[19]   Videotape, 10:37:04.

[20]   Videotape, 10:37:10–10:37:11.

[21]   Videotape, 10:37:11–10:37:49.

[22]   Videotape, 10:37:50–10:37:53.

-4-

| | |
|---|---|
| Trooper Cleveland: | Can I search your car? |
| Bumpers: | I would prefer you didn't. |
| Trooper Cleveland: | Can I search it, though? |
| Bumpers: | I would prefer you didn't. |
| Trooper Cleveland: | Okay, but I am asking you, can I search your car? |
| Bumpers: | (muffled response) |
| Trooper Cleveland: | No?  If no say "No." |
| Bumpers: | No. |
| Trooper Cleveland: | What I am going to try to do is get a K-9 to come up here then to do a sniff of your vehicle.[23] |

Once Trooper Cleveland said he was going to call in a K-9 unit, Bumpers offered to show Trooper Cleveland his prescription medication before he called the K-9 unit.[24]  After asking him several questions about the prescription medication, Trooper Cleveland then asked Bumpers why he would not allow him to search his vehicle.[25]  Bumpers replied he had always said "No."[26]  Trooper Cleveland then reconfirmed that Bumpers' answer was still "No" regarding permission to search.[27] Bumpers then asked, "Do you think I got drugs?"[28]  To which, Trooper Cleveland responded that he thought some illegal activity going on.[29]  Trooper Cleveland next asked a few questions about Bumpers health, and called for a canine unit.[30]

---

[23]  Videotape, 10:37:55–10:38:11.

[24]  Videotape, 10:38:14–22.  Bumpers takes prescription medication for high blood pressure and other health problems.

[25]  Videotape, 10:39:16.

[26]  Videotape, 10:39:18–10:39:29.

[27]  Videotape, 10:39:30–10:39:32.

[28]  Videotape, 10:39:33–10:39:35.

[29]  Videotape, 10:39:36–10:39:39.

[30]  Videotape, 10:39:43–10:40:15.

**The Field Sobriety Test**

After calling for the canine unit, Trooper Cleveland asked Bumpers whether he should be driving based on his prescription medications.[31]  Bumpers did not know of any driving limitations. Trooper Cleveland noted that Bumpers had red eyes, an eye tremor, and dry mouth.  In his subsequent police report, Trooper Cleveland also stated that Bumpers had slurred speech.[32]  As a result, Trooper Cleveland informed Bumpers he was going to run him through some field sobriety tests.[33]  As Trooper Cleveland began conducting the field sobriety tests, Bumpers asked Trooper Cleveland to give him a breathalyzer test.[34]  Trooper Cleveland responded that not all drugs show up on a breathalyzer test, so he needed to test his impairment with the field tests.[35]  Bumpers failed the field sobriety tests, and Trooper Cleveland handcuffed and arrested him.  Upon arrest, Bumpers again asked Trooper Cleveland for a breath test.[36]  He also asked Trooper Cleveland to take a blood test from him so Bumpers could prove that he had nothing in his system to impair him.[37]

**The Search of the Vehicle**

Trooper Cleveland placed Bumpers in his patrol vehicle and then began conducting a search of Bumpers' vehicle while it was on the side of the road.[38]  Trooper Cleveland stated on the

---

[31]  Videotape, 10:40:22.

[32]  DUI Report Form, 1 (Docket No. 13, Ex. D).

[33]  Videotape, 10:40:56.

[34]  Videotape, 10:40:00.

[35]  Videotape, 10:40:04–10:42:17.

[36]  Videotape, 11:04:35–11:04:39.

[37]  Id.

[38]  Videotape, 11:05:36–11:57:00.

recording that it was an "inventory" search.[39]   Approximately thirty minutes after Trooper Cleveland said he was going to call for a K-9 unit, and ten minutes after Trooper Cleveland started the "inventory" search, the K-9 unit arrived.[40]   The officer from the K-9 unit then assisted Trooper Cleveland in searching the vehicle for approximately an additional forty minutes.[41]

Once the inventory search was completed, the K-9 officer allowed his dog to do an exterior canine sniff.[42]   Because the officers left the trunk open after their inventory search, the dog also jumped in the trunk to do a sniff.[43]   The dog later scratched at one of the doors, so the K-9 officer opened it, and the dog entered the vehicle.[44]   Subsequently, the officers conducted an "investigatory" search for narcotics because the dog had alerted to drugs.   During this search, the officers removed door paneling and other parts of the vehicle to conduct a more thorough search.   The "investigative" search lasted about an hour, which included the time it took for the officers to replace the car parts back to their original location.[45]

During these searches, the officers located large, black magic markers, but nothing illegal was found.[46]   Trooper Cleveland stated in his deposition that he believed the magic markers were

---

[39] Videotape, 11:03:39–11:03:43; see also Drug Influence Evaluation, ¶ 13 (Docket No. 13, Ex. D) (referring to when he "inventoried the car").

[40] Videotape, 11:15:32.

[41] See videotape, 11:05:36–11:57:00.

[42] Videotape, 11:57:38.

[43] Videotape, 11:58:12–11:58:36.

[44] Videotape, 11:59:15–11:59:49.

[45] See videotape, 12:02:48–13:01:12.

[46] Trooper Cleveland did locate a gun in the vehicle.   When he questioned Bumpers about it, Bumpers said it was registered to him and he had a concealed weapons permit in his wallet.

used as an inhalant, and that they caused Bumpers' impairment.[47]  Bumpers later explained at the police station that he uses the magic markers every day to color the gray hairs on his upper lip.[48]  At the time of the stop, Bumpers had black marker on his upper lip.[49]

After the two searches were completed, Bumpers' vehicle was loaded onto a tow truck. Trooper Cleveland then transported Bumpers to the police station at 13:13 p.m.—approximately three hours after the initial stop.  When Bumpers arrived at the police station, Trooper Cleveland reported that Bumpers "still had the same impairment [sic] signs as he did out on the roadway,"[50] and he failed a "finger to nose" test.[51]  Bumpers then submitted to a drug evaluation, which included being given a breath test and supplying urine and blood samples.[52]  The breath, urine, and blood tests all were negative for any drugs in Bumpers' system.[53]  Consequently, Bumpers was released from custody.

## ANALYSIS

## I.    QUALIFIED IMMUNITY AND SUMMARY JUDGMENT STANDARD

"[G]overnment officials performing discretionary functions, generally are shielded from

---

Videotape, 11:12:12–11:13:00; 13:05:30–13:07:43.  No further issue was made of the gun.

[47]  Cleveland Depo., 26:23–27:13.

[48]  Drug Influence Evaluation, ¶ 10 (Docket No. 13, Ex. D).

[49]  Id. ¶ 9.

[50]  Id. ¶ 5.

[51]  Id. ¶ 7.

[52]  DUI Report Form, ¶ X (Docket No. 13, Ex. D).

[53]   See id. (stating alcohol content .000); see also Cleveland Depo., 27:18–23 (indicating no intoxicants where found in Bumpers' system).

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[54]   Although Trooper Cleveland has invoked the qualified immunity defense, it is Bumpers who must show (1) that the "officer's conduct violated a constitutional right,"[55] and (2) "the right was clearly established," such that "it would be clear to a reasonable officer that his conduct was unlawful."[56]   In determining whether a plaintiff has met its burden, courts "view the evidence in the light most favorable to the plaintiff."[57]

If Bumpers meets his burden, the burden then shifts to Trooper Cleveland to prove that he is entitled to summary judgment.[58]   "Summary judgment is appropriate if [Trooper Cleveland] demonstrates that 'there is no genuine issue as to any material fact' and that [he] is 'entitled to judgment as a matter of law.'"[59]   Trooper Cleveland may meet his burden "by showing that [Bumpers] does not have enough evidence to carry [his] burden of persuasion at trial."[60]   When determining whether a nonmovant has enough evidence to carry his burden at trial,  "all justifiable inferences are to be drawn in his favor."[61]

---

[54]  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982) (citations omitted).

[55]  <u>Fogarty v. Gallegos</u>, 523 F.3d 1147, 1155 (10th Cir. 2008) (quotations and citation omitted).

[56]  <u>Id.</u> (quotations and citation omitted).

[57]  <u>Lawmaster v. Ward</u>, 125 F.3d 1341, 1347 (10th Cir. 1997) (citations omitted).

[58]  <u>Id.</u> (citations omitted).

[59]  <u>United States ex rel. Burlbaw v. Orenduff</u>, 548 F.3d 931, 944 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).

[60]  <u>Trainor v. Apollo Metal Specialties, Inc.</u>, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted).

[61]   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citations omitted).

## II.    SEARCH AND SEIZURE

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[62]   "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.[63]   A seizure may nevertheless be lawful if it was (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."[64]

### A.    Justification at Inception

"A traffic stop is justified at its inception if the stop is based on an observed traffic violation or if the police officer has [a] reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[65]   This inquiry focuses on an officer's objective assessment rather than a subjective motive.[66]   "Thus, as long as [an officer] has a *particularized and objective basis* for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality."[67]   "In determining whether this objective standard has been met, the focus necessarily centers upon the

---

[62]   U.S. Const. amend. IV.

[63]   Whren v. United States, 517 U.S. 806, 809–10 (1996) (citations omitted).

[64]   State v. Patefield, 927 P.2d 655, 657 (Utah Ct. App. 1996) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)).

[65]   United States v. Dameshghi, No. 2:08-cr-127, 2009 U.S. Dist. LEXIS 66819, at *16 (D. Utah, July 31, 2009) (quotations and citation omitted).

[66]   Fogarty, 523 F.3d at 1156.

[67]   United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004) (second emphasis in original).

facts known to the officer immediately before the stop."[68]

On the videotape, Trooper Cleveland articulated that Bumpers was following a semi-truck too closely and that he possibly had a cracked windshield.  Previously, the Utah Court of Appeals has addressed whether an officer may initiate a stop based on a cracked windshield.  Based on Utah law, the court concluded that a stop may not be initiated unless it was reasonable for the officer "to believe that the windshield was cracked to an impermissible degree."[69]  Merely seeing a glare or sparkle in the window is insufficient to support a stop.[70]  Here, Trooper Cleveland simply stated the windshield might be cracked.  Based on the angle of his vehicle to Bumpers, Trooper Cleveland had no articulable basis to conclude the windshield was cracked to an impermissible degree.  Indeed, upon pulling Bumpers over, no crack was even in the windshield.  This basis therefore cannot support the stop.

With respect to following too closely, Trooper Cleveland said he observed Bumpers following a semi-truck too closely before he turned on his video camera.  Trooper Cleveland's declaration states he made a U-turn at 10:16 a.m. to head northbound on Interstate 15.  He did not see Bumpers before making the U-turn.  Trooper Cleveland activated the recorder at 10:17:05 for two seconds.  The recording shows a significant distance between Trooper Cleveland and Bumpers.  Trooper Cleveland then reactivated the recorder at 10:18:24 when he was much closer to Bumpers' vehicle, and said that a minute ago he had viewed Bumpers following the semi-truck too closely.

---

[68] State v. Galvan, 2001 UT App 329, ¶ 11, 37 P.3d 1197 (quotations and citation omitted).

[69] Id. ¶ 15 (emphasis removed).

[70] Id. ¶ 16.

He then stopped Bumpers at about 10:18:49 after it looked "like he's getting close again."[71]  Again, the court looks at whether Trooper Cleveland had a particularized and objective basis for concluding that Bumpers was following a semi-truck too closely.  The videotape shows that a minute prior to Trooper Cleveland re-activating his video recorder, he was too far from Bumpers to reasonably assess whether Bumpers was following too closely.  When he was closer, the footage shows what appears to be sufficient space in between the vehicles.[72]  While Trooper Cleveland disagrees about the length of space in between the two vehicles, the court must view the facts in the light most favorable to Bumpers.  When the facts are viewed in this light, they fail to support that Trooper Cleveland had reasonable suspicion to believe that Bumpers was committing a traffic violation.

### B.        Scope of a Traffic Stop

Even if Trooper Cleveland were justified in stopping Bumpers, "[o]nce a traffic stop is made, the detention 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'"[73]  Both "[t]he length and scope of the detention 'must be strictly tied to and justified by the circumstances which rendered its initiation permissible.'"[74]  Therefore, "[d]uring a routine traffic, an officer may request a driver's license and vehicle registration, run a computer check, and issue

---

[71]  Videotape, 10:18:42–10:18:47.

[72]  Trooper Cleveland submitted a declaration that states:  "At approximately 10:18 am, while driving northbound, I approached a white Pontiac Grand Prix following a semi-truck too closely."  Cleveland Decl., ¶ 8 (Docket No. 13, Ex. A).  This is a conclusory statement, which lacks sufficient facts to support that Bumpers was following the semi-truck too closely.

[73]  State v. Lopez, 873 P.2d 1127, 1132 (Utah 1994) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

[74]  State v. Johnson, 805 P.2d 761, 763 (Utah 1991) (quoting Terry, 392 U.S. at 19).

a citation for the traffic violation."[75]  Thereafter, the detainee must be allowed to proceed on his way

unless "the officer develops a reasonable and articulable suspicion that the driver has engaged or is

engaging in illegal activity or if the initial detention has become a consensual encounter."[76]

      1.   Initial Consent

After Trooper Cleveland asked Bumpers about his travel plans, checked his license and

registration, conducted a background check, and returned Bumpers' documents to him, Bumpers

moved to return to his vehicle.  At that point, Trooper Cleveland asked Bumpers if he could ask him

some additional questions, to which Bumpers responded, "Sure."  It is unclear from Trooper

Cleveland's deposition testimony whether he believed Bumpers was free to leave after he returned

his documents.  Trooper Cleveland testified that while he was waiting to get Bumpers' license and

registration, "I did notice some signs of impairment that had me concerned he might be impaired."[77]

Yet, he also testified that he lowered the detention to a consensual encounter to continue his

questioning.[78]  Additionally, he wished Bumpers a nice trip, implying he was free to leave.  This

action is inconsistent with Trooper Cleveland's later testimony that he had noticed signs of

impairment.  If Trooper Cleveland had articulable suspicion that Bumpers was indeed impaired, it

is inconceivable that he would have allowed him to continue on his way.

Moreover, if Trooper Cleveland were concerned about Bumpers being impaired, his initial

questioning after returning Bumpers' documents did not indicate this.  Trooper Cleveland's

---

[75] United States v. Wisniewski, No. 05-4241, 2006 U.S. App. LEXIS 21258, at *17 (10th Cir. Aug. 16, 2006) (citation omitted).

[76] Dameshghi, 2009 U.S. Dist. LEXIS 66819, at *20 (citation omitted).

[77] Cleveland Depo., 14:12–13 (Docket No. 13, Ex. B).

[78] Id. at 19:24–20:22.

questions pertained to Bumpers' travel plans and whether Bumpers was carrying large amounts of

currency, weapons, explosives, illegal drugs, heroin, cocaine, methamphetamine, and marijuana.

As Trooper Cleveland asked Bumpers these questions, Bumpers attempted to determine why he was

being asked them.  He stated, "Why do you think – May I show you something – Sometimes people

think my eyes – I have glaucoma."  After Bumpers extracted a card from his wallet to show Trooper

Cleveland that his eyes were red due to glaucoma, Trooper Cleveland responded "I am not worried

about your eyes."  Thus, Trooper Cleveland's initial questions and response to Bumpers' red eyes

show no concern that Bumpers was impaired.  Rather, they indicate that Trooper Cleveland was

probing for information about illegal activity.[79]

This fact is born out by some of Trooper Cleveland's other questions and statements.  Even

after Bumpers informed Trooper Cleveland that he had prescription medication in his vehicle,

Trooper Cleveland continued to press Bumpers about searching his car.  When Bumpers asked him

if he wanted to search his car because he thought there were drugs, Trooper Cleveland responded

that he thought there was some illegal activity going on.  Trooper Cleveland reiterated this concern

during his deposition."[80]

"Implausible travel plans can contribute to reasonable suspicion."  Id. at 1129 (citations

omitted).  Bumpers' answers to Trooper Cleveland's questions, however, did not show that Bumpers'

travel plans were implausible.  Moreover, Trooper Cleveland's background search yielded no report

of prior criminal conduct by Bumpers.  Furthermore, Trooper Cleveland has not provided the court

---

[79] The court is aware that driving under the influence is illegal.  In this decision, however, the court's reference to illegal activity pertains to Trooper Cleveland questioning Bumpers about whether he was carrying illegal weapons, explosives, heroin, cocaine, methamphetamine, marijuana, etc., and not to Bumpers' purported impairment.

[80] Cleveland Depo., 19:12–13.

with any specific facts or reasons that support Bumpers was engaged in illegal activity.  The court therefore concludes that Trooper Cleveland had no reasonable basis for his suspicion of illegal activity.  Consequently, Trooper Cleveland's questioning about illegal activity exceeded the scope of the stop.  Nevertheless, these initial questions were permissible because Trooper Cleveland had obtained Bumpers' consent to ask additional questions.

2.    <u>Rescission of Consent</u>

After Trooper Cleveland questioned Bumpers about illegal activity, he then asked to search Bumpers' vehicle.  To this, Bumpers said "No."  Bumpers persisted in denying consent notwithstanding Trooper Cleveland's repeated pressuring for him to allow the search.  "[C]onsent is not required for a dog sniff of a lawfully detained vehicle even absent individualized reasonable suspicion."[81]  Consent is required, however, "for continued detention beyond the lawful period."[82]  In *United States v. Bravo*, the United States Court of Appeals for the Tenth Circuit stated that once a person "refuse[s] to grant consent to search his vehicle or run a drug dog around it," the detention is not consensual.[83]  Thus, Trooper Cleveland had to have a reasonable articulable suspicion to continue detaining Bumpers for the exterior canine sniff after Bumpers refused to consent to the search.

As discussed above, Trooper Cleveland has articulated no facts to support that Bumpers was engaged in illegal activity.  Moreover, even if Trooper Cleveland believed that Bumpers showed

---

[81]  <u>United States v. Chavira</u>, 9 F.3d 888, 889 n.1 (10th Cir. 1993) (quotations and citation omitted).

[82]  <u>Id.</u>

[83]  <u>United States v. Bravo</u>, No. 08-6014, 2009 U.S. App. LEXIS 247, at *12 (10th Cir. Jan. 7, 2009); <u>see also</u> <u>United States v. Kaguras</u>, No. 05-8103, 2006 U.S. App. LEXIS 14479, at *2 (10th Cir. June 9, 2006) (stating that after the defendant "refused to consent to further detention," the officer was required to have "reasonable suspicion to . . . conduct a canine sniff").

signs of intoxication, this does not explain why a canine sniff of Bumper's vehicle fell within the permissible scope of the detention.  Although Bumpers offered to show Trooper Cleveland his prescription medications once Trooper Cleveland said he was calling for a K-9 unit, this did not imply consent to search the vehicle.  When the facts are viewed in the light most favorable to Bumpers, he was impermissibly seized at the point in time when he refused consent and Trooper Cleveland stated he was calling for a K-9 unit.

3.   Field Sobriety Test

Before subjecting a person to a field sobriety test, as with other forms of detention, an "officer must have reasonable suspicion."[84]  Trooper Cleveland admits that Bumpers was not swaying and that he had no odor of alcohol.[85]  He testified, however, that Bumpers showed signs of impairment because he had slurred speech, dry mouth, red eyes, and an eye tremor.  While Bumpers' speech on the recording does not appear slurred, and Bumpers explained his red eyes, the court must look at the totality of circumstances.  Besides the red eyes and slurred speech, Trooper Cleveland testified that Bumpers had dry mouth and an eye tremor.  Trooper Cleveland further testified these are signs of impairment, based on his training manuals.[86]  Bumpers has offered no evidence to refute this testimony so as to place a material fact in dispute.  The court therefore concludes, but for the illegal stop and detention, Trooper Cleveland would have articulated sufficient facts to justify conducting a field sobriety test.[87]

---

[84]   Vondrak v. City of Las Cruces, 535 F.3d 1198, 1206 (10th Cir. 2008).

[85]   Cleveland Depo., 18:14–18; 19:3–4.

[86]   Cleveland Depo., 19:9–16.

[87]   Trooper Cleveland continues to maintain that Bumpers was intoxicated at the time of arrest.  See Cleveland Depo., 27:10–23 (Docket No. 13, Ex. B).  Although the blood, urine, and breathalyzer

4.      Inventory Search

After Trooper Cleveland arrested Bumpers when he failed the field sobriety tests, Trooper Cleveland informed Bumpers he was going to conduct an inventory search of Bumpers' vehicle for the protection of both of them "so that no one can say anything disappeared."[88]  Officers commonly conduct an inventory search when they impound a vehicle.[89]  Such searches do not require a warrant because they are merely administrative in nature.[90]  As Trooper Cleveland stated, the purpose of an inventory search is for "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger."[91]

Limitations, however, do apply to such searches.  They must be done "according to standardized procedures."[92]  Additionally, the search "should be designed to produce an inventory."[93]  In other words, "'the search cannot be investigatory in nature but must instead be used only as a tool

---

tests were all negative for any drugs in Bumpers system, Trooper Cleveland maintains this is because inhalants do not remain in the blood stream for very long.  Id. at 27:21–23.  This statement is inconsistent with Trooper Cleveland's other statement that Bumpers was still showing the same signs of impairment when they arrived at the police station, and that Bumpers failed a finger to nose test at that time.  Drug Influence Evaluation, ¶¶ 5, 7 (Docket No. 13, Ex. D).  If Bumpers were still showing signs of impairment when he arrived at the police station due to inhalants, it stands to reason that the inhalants would have still been in his system.  Yet, the tests that were done at that time do not support this conclusion.  The court therefore questions whether Bumpers' inability to do the field tests was due to inhalants in his system.

[88]  Videotape, 11:03:38–11:03:48.

[89]  United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003).

[90]  Id.

[91]  Id. (quotations and citation omitted).

[92]  Id. (quotations and citation omitted).

[93]  Id. (quotations and citations omitted).

to record the [person's] belongings to protect the police from potential liability.'"[94]  This means, "'[a]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.'"[95]

Here, the inventory search took approximately fifty minutes, and was conducted by two police officers.  Trooper Cleveland asserts he recorded the contents of the search through the videotape.  Yet, when the videotape is viewed in the light most favorable to Bumpers, the only item catalogued was a pocket knife that Trooper Cleveland stated he was returning to the glove compartment at the start of the search.[96]  Often, the officers were partially inside the vehicle and neither they nor the items they were purportedly cataloging could be seen.  When they were searching through Bumpers' bags and containers, one cannot tell what is being viewed.  Moreover, neither officer took any notes, nor was any itemization produced as part of this motion.  In other words, despite fifty minutes of video recording, no protection was afforded against a claim of lost or stolen property because Bumpers' items were not cataloged.  Instead, the videotape shows an exhaustive search of the car, including lifting out the spare tire and searching underneath it.  The length and nature of the search appear to have been investigative rather than purely administrative when the facts are viewed in Bumpers' favor.  Trooper Cleveland therefore impermissibly exceeded the scope of an inventory search.

## III.   CLEARLY ESTABLISHED LAW

To prevail against a defense of qualified immunity,"the right the official is alleged to have

---

[94]  Id. (quoting United States v. Edwards, 242 F.3d 928, 938 (10th Cir. 2001)).

[95]  Id. (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)).

[96]  Videotape, 11:05:45–11:05:47.

violated must have been 'clearly established' . . . : The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[97]  If "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," then "no immunity is available."[98]  The Tenth Circuit Court of Appeals has stated that, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other Courts must have found the law to be as the Plaintiff maintains."[99]  This does not mean a plaintiff must "cite to a factually identical case."[100]  Instead, it means that prior cases must have "some but not precise factual correspondence in demanding that officials apply general, well developed legal principles."[101]  As is evident from the citations in this case, at the time of the stop, there were Supreme Court, Tenth Circuit, and Utah court cases that defined the contours of the law and rights that Bumpers had relative to the initial stop, search of the vehicle, canine sniff, and the inventory search.   Because the law was clearly established in these areas, Trooper Cleveland is not entitled to qualified immunity.

## IV.   OTHER CLAIMS

### A.   EQUAL PROTECTION CLAIM

Bumpers alleges in his Complaint that Trooper Cleveland, "traveling south bound on I-15, passed Plaintiff traveling in the opposite direction, looked over and observed Plaintiff, made a U-turn

---

[97]  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

[98]  Hope v. Pelzer, 536 U.S. 730, 746 (2002) (quotations and citation omitted).

[99]  Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995) (quotations and citation omitted).

[100]  Lawmaster v. Ward, 125 F.3d 1341, 1351 (10th Cir. 1997).

[101]  Id. (quotations and citation omitted).

and pulled the Plaintiff over."[102]   Bumpers further asserts that "Plaintiff was only stopped because of his race and not because of a traffic infraction."[103]   Trooper Cleveland seeks summary judgment on Bumpers' claim that Trooper Cleveland violated Bumpers' Fourteenth Amendment equal protection rights.   He does so on the basis that Bumpers has not provided sufficient evidence to carry his burden of persuasion at trial.   Indeed, Bumpers has not come forward with any evidence to support his allegation.   He has offered no affidavit, no documents, no deposition testimony, or any other such evidence so as to carry his burden.   Summary judgment is therefore granted on this count and Bumpers' equal protection claim is dismissed.

### B.   Fourteenth Amendment Substantive Due Process Claim

Bumpers also asserts a substantive due process claim under the Fourteenth Amendment.   The United States Supreme Court has "been reluctant to expand the concept of substantive due process."[104]   Consequently, "where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."[105]   When a plaintiff claims "an unconstitutional seizure by an officer," it therefore "is properly analyzed under the Fourth Amendment standard rather than under a substantive due process standard."[106]   Because this case involves an alleged wrongful stop, detention, and search, it should be addressed as a Fourth Amendment claim.   Accordingly, summary judgment also is granted on this count and

---

[102]   Complaint, ¶ 10 (Docket No. 2).

[103]   Id. ¶ 45.

[104]   County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (quotations and citation omitted).

[105]   Id. (quotations and citations omitted).

[106]   Lawmaster, 125 F.3d at 1351 n.4 (citing Graham v. Connor, 490 U.S. 386, 388 (1989)).

Bumpers' substantive due process claim is dismissed.

## ORDER

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART Trooper Cleveland's Motion for Summary Judgment.[107]  The court grants summary judgment on and hereby dismisses Bumpers' Fourteenth Amendment equal protection and substantive due process claims. Because Trooper Cleveland is not entitled to qualified immunity on Bumpers' Fourth Amendment search and seizure claim, the court denies summary judgment on that count.

IT IS FURTHER ORDERED that the stay on discovery is lifted.  The parties shall submit a new proposed scheduling order by **September 25, 2009**.

DATED this 28th day of August, 2009.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[107]  Docket No. 12.